May it please the Court, Alonzo Wickers, on behalf of Appellant Electronic Arts, I'd like to reserve two minutes for my rebuttal, please. Counsel, you agree, I assume, that we have a case that controls the principal issue? Yes, Your Honor. Keller is certainly before the Court, and a central theme of the plaintiff's argument is that Keller controls here. But I think there are certain limitations on that argument. First of all, we certainly have the right to raise our arguments in order to preserve them for en banc review or cert petition. But I don't think the scope of this appeal should be that narrowly circumscribed by Keller, and here's why, Your Honor. One overlooked aspect of the Keller majority opinion, and also the Hilton decision from this Court, is that both panels explicitly reserve for another day the question of whether the First Amendment provides a broader defense against right-of-publicity claims that target expressive works than were raised in those cases. So each of those panels left that question open for future courts to decide in the circuit. And we believe that the ones that were raised in those cases. So I believe in Hilton the two defenses that were raised, Your Honor, were transformative use and the public affairs exemption. But the incidental use wasn't, so that's what you're talking about. The incidental use defense was not raised, nor did the Court foreclose the possibility that there may be a separate, broader formulation of constitutional protection that a future panel could come up with if it felt that the current state of the law did not adequately protect expressive works against right-of-publicity claims. So what's the theory we're supposed to come up with? Incidental use or something else? Incidental use is certainly one. Well, you didn't raise that, so that's waived. We didn't raise it below, Your Honor. But it's a legal argument, Your Honor, and all the evidence that the Court needs to consider is in the record, essentially the games. Such as what? The commercial use? The games, Your Honor. The extent to which the images are important to the success? I mean, the incidental use test has got some factual components to it. How are we going to, as a matter of law, determine that there's an incidental use defense here? We believe that as the Court did, for example, in the Johnson case or the Aligo case, that the Court can examine the works in question and determine the manner in which the alleged likenesses of the plaintiffs appear, and on that basis make a determination that the use was incidental. But we should decide that the use of the images in this case, on this record, are incidental or not incidental and decide as a matter of law that that's conclusive? We believe you may, Your Honor, but that's not the only formulation of a test that we think may be appropriate here. One of the issues that was not considered, Your Honor, in Keller, it wasn't considered in Hilton, it wasn't considered in No Doubt or in Hart, and I think it's a preliminary or a fundamental issue the Court needs to look at, and that is whether or not the right of publicity as applied to expressive works. We're not talking about as applied to advertising and commercial products here. We're talking about just as it applies to expressive works, the question of whether the right of publicity is a content-based regulation of speech in that context that we have presented before us today. And that's a fundamental issue a court should examine whenever it is considering a statute that regulates speech. It was examined in the Frazier v. Boomsma case, the district court in Arizona seven years ago, invalidated the right of publicity statute in that State on the grounds that that statute was a content-based regulation on speech. Okay. Can you tell us where in your briefs you made this argument? Yes, Your Honor. It's on pages 18 to 21 of our opening brief. It was not responded to by either the plaintiffs or by their amicus screen actors guild in this case. But why do you think that this was not involved in Keller? I mean, I thought the whole issue and the whole argument, at least the dissenter in Keller, talked about content-based speech regulation, no? I don't believe that Judge Thomas in his dissent, he expressed his sharp disagreement with the majority on the transformative use issue, but he didn't address specifically whether it was a content-based regulation on speech. The issue was raised and briefed in Keller by both EA and by the Players Association in its amici brief, but it wasn't addressed either in the majority opinion or in the dissent, I don't believe, Your Honor. So is your argument, the one on 18 to 21, essentially that the entire doctrine is invalid under the First Amendment? Is that your argument? No, Your Honor, it's not. And I think, first of all, as I said, it's very important to distinguish there's a long line of cases in this circuit applying the right of publicity to advertising, commercial sponsorship. So outside of commercial speech, it's invalid. Is that your argument? Yes. I'm arguing specifically with respect to as the right of publicity applies to expressive works, books, films, video games, paintings and the like. And anything that's not commercial speech. Correct, Your Honor. And I think there is a – here's how we would frame an approach that would pass constitutional muster if the appropriate level of strict scrutiny review were to be used. First of all, as I said, anything using – anything using someone's name or likeness in commercial speech, the long line of cases from this circuit that recognize you need that celebrity's consent, that's the law. So that Bette Midler case, Tom Waits, all those cases would not be affected by our arguments there, by the outcome of this case. We believe there should be a second standard that is reserved for per se expressive works. That would be books, films, paintings, video games, which under Brown v. ENA are entitled to the same level of constitutional protection as those other works I just mentioned. And in that – Just a minute. The whole premise of Keller and of the Third Circuit case, as I understand it, is that there is a First Amendment problem here, but that there are doctrines in those defenses that mitigate it. So they're assuming that there's a First Amendment problem. And I don't really understand what you're saying that's different than that. You're just – you're just trying to jump over all the defenses with this argument? Is that essentially what you're doing? No, Your Honor. We're trying to provide a framework for analyzing these cases that's adequately protective of expressive works. And we don't believe the current framework does that. And since both in Keller and in Hilton, the Court left open for another day the question of whether there is another framework for analyzing it. Where is that in Keller? Tell me what footnote was that. It's footnote 5, Your Honor, in Keller, and I believe it's footnote 11 in Hilton. And the – No. Whether the First Amendment furnishes a defense other than that those parties raise. So your defense is there is no defense. It's just a First Amendment violation. No, Your Honor. And as I said, commercial speech, we believe, is subject to one existing set of defenses. Secondly, per se expressive works, we believe, should be entitled to a broader degree of protection than is currently afforded under the existing tests. We would propose, again, something akin to what the restatement posits, which provides protection for expressive works unless there's no artistic relevance to the use of the celebrity's name or likeness or if there is essentially an instance where an expressive work uses someone's name or likeness in a disguised advertising type of context. But I would also propose a third category here, Your Honor, because I think where the law started to go awry in this area was in 2001 with the Comedy III transformative use decision. Up until that time, as the Court noted in Guglielmi, for the most part, courts had been able to decide these two issues, these types of cases, if it was used in a commercial work, commercial speech, it was deemed to be infringing the right of publicity. If it was in an expressive work, courts found that the First Amendment prevailed. In 2001, unfortunately, Comedy III came down. And the Court got twisted in a way in Comedy III because Comedy III involved a lithograph, a charcoal sketch of the Three Stooges, an original lithograph that was then imprinted onto a fungible consumer good, a T-shirt. And the California Supreme Court, I think, in some ways, wrapped itself in knots because it deemed relying on Cohen from the U.S. Supreme Court, the antiwar T-shirt case, the Supreme Court found that T-shirts were somehow expressive works, merely because an expressive work had been imprinted on the T-shirt in that case, and then crafted a test that purported to apply to all expressive works based solely on this T-shirt case. What I would submit the Court should have done and what provides greater protection and adequate protection for the First Amendment would be a third category test for works like the T-shirt in question in Comedy III, like the greeting card in Hilton. The transformative use test would be sufficient in that circumstance. It is not, however, sufficient in a case like this one that involves the use of a celebrity's name or likeness in a per se expressive work like our client's video games. In other words, the video game is more of an expressive work than a greeting card or a T-shirt. A video game is per se an expressive work, Your Honor. What does that mean, per se? You can have a T-shirt, for example. The one I'm wearing under my shirt today, Your Honor, has no content on it, no expression. It's not an expressive work. The Court, however, in a greeting card. A greeting card can be a – you can have a plain greeting card that has no expression. Well, I know, but 99 percent of greeting cards, it seems to me, have pictures and they have writing and they're at least as expressive as a video game, probably more so. Well, I would – I would disagree with that premise, Your Honor. I think if you look at the video game and all of the different aspects that go into EA's video game, both from a graphic design standpoint, a software standpoint, editorial curating standpoint, determining what teams are historic teams, what skill levels to assign to different players, there's a huge amount of information. I believe that the materials that are attached in the supplemental excerpts of record by the plaintiffs in this case, one of them reflects that there are over 390,000 data points that go into making a – Well, that doesn't sound very expressive. It sounds collective. It sounds like a bunch of data. Well, data is certainly expressive, Your Honor. We have reference guides and dictionaries and other things. But in fact, the mere fact that the plaintiffs have sued here, why have they sued? Why were the plaintiffs included in these games? Because they were members of historic teams. EA made a determination based on its review of NFL history as to what teams qualified as historically significant teams. That in itself is a kind of editorial decision and in fact involves expression. The game itself has all sorts of artistic expression in it in terms of the shading, the way the athletes are portrayed, the way the settings are created. So we would submit that there's a great deal of artistic expression embodied in that work. All right. Kathy, you're over time now. Thank you, Your Honor. We'll give you a minute or two for rebuttal. Thank you. May it please the Court. Good morning. My name is Brian Henry, and I represent retired NFL players Michael Tony Davis, Vince Ferragamo, and Billy Joe Dupree. The First Amendment ---- What do you understand this footnote 5 in Keller to mean? I ---- it's difficult to say what it means. It's basically a placeholder saying that the Supreme Court or some other court could potentially come up with a different standard. I don't understand the Supreme Court. It said we. We meaning the Ninth Circuit. Well, the Ninth ---- So we reserve something. What do we reserve? I didn't write it. I don't know what they mean. Well, I didn't write it either. But what I'm asking is, is there ---- as I understand the arguments being made, which was clearer at the beginning than at the end, it was essentially that there is a sort of supervening argument that really hasn't been considered. And that is that because it wasn't raised as such in Keller, I guess, and I don't know if it was or wasn't. And that is that this is content-based speech. As long as it's not commercial speech, you can't do it, period, the end. None of the ---- you don't have to get into any of this transformative or incidental or public affairs or anything else. As long as it's not commercial speech, you can't have a right of publicity claim. Has that issue been decided? Well, it has. There is no court that has held that the right of publicity claim ---- I understand that, but I want to know whether that issue has been raised and decided as such. Sure. Well, it was raised, for instance ---- it was raised, for instance, in the Hart case before the district court, and the district court rejected it, saying that content-based speech refers to a viewpoint regulation. Well, it doesn't. That's not true. That's wrong. Well, the court ---- there are several cases that have said that ---- and I'll give you the specific site the Court used. Well, but that's not really the question. The question is, is there something open after Keller as to this question in the Ninth Circuit? I don't believe there's any open issue left for this Court to decide. In Keller, the Court addressed the question of what is the appropriate test to apply to right of publicity claims, and it held that the transformative use test was the proper test, as formulated by the California Supreme Court in Comedy 3. There's ample precedent that from the Third Circuit in Hart that ---- But then it dropped a footnote saying maybe there's something else, but we're not discussing it right now. Well, there's no footnote in the Hart ---- in the Third Circuit opinion. There's ---- there's, you know, for instance, in the California Court of Appeals, in the no-doubt case, they also reached the exact same conclusion. There's no footnote in that case either. All of the cases, whether it be the Third Circuit, the Ninth Circuit case, the two district court cases in the northern districts of California, they've all reached the same conclusion. The transformative use test is the proper test. Now, it's very clear that EA fails that test. The game ---- the very purpose of the game is to have a realistic simulation of NFL players, impersonating the NFL players. EA wrote ---- well, first of all, EA admits for the purposes of these motions that it used protectable likenesses without permission. In recent briefing before the U.S. Supreme Court, EA credited its accurate simulation of NFL players' likenesses to the success of the game. It wrote, quote, the Madden titles are successful because they allow players to simulate play involving any of the 32 NFL teams using real NFL players and real NFL coaches. The simulations capture the nuances of NFL contests to the fullest extent technology allows, including not only on-field play, but also teams, logos, and colors, player uniforms, and the team's tendencies and capabilities, and even the players' celebrations and crowd chants. I would argue, and I think that the U.S. Supreme Court in Zucchini made the point very clear, that the right of publicity is very similar to copyright or patent law, and therefore the protections afforded under the transformative use test is the correct test. EA did not raise any of these scrutiny arguments before the district court, and I would posit that they're improper here. Can you address the incidental use, speaking of new theories? Sure. Well, I would agree with Your Honor that I believe that those are waived, first of all. Well, I stated it, but he rebutted me. Sure. Well, and you could hardly say that use of the retired players' likenesses is incidental to a game that seeks to simulate their play. The majority... Should we decide, as a matter of law, that it does or doesn't apply here? Well, I think it's a factual determination, number one. Okay, so what are the facts? Just give me some examples of the facts that would be open for dispute at the district court. Sure. Well, is there value in the images? Did it enhance the game? And clearly, you know, the questions seem pretty clear that there is value. They pay $35 million a year for active players' likenesses for the game. They pay for Hall of Fame players. They pay coaches, assistant coaches, even stadiums. Is that in the record? Yes, it is. So we could decide that? Well, I think if you were going to decide against it, you could conceivably reject it, as there's already sufficient facts. But I think if you were to say that there were no sufficient facts and that there would be we would need to provide evidence of other facts that we should be afforded discovery into those areas. And I would also say that the Keller majority, in a footnote, basically rejected the incidental use defense because it was raised in the dissent. What footnote was that? I do not have that in front of me, but I have the quote of the footnote. This is what the court said. The fact that EA elected to use avatars that mimic real-life college players for a reason. If EA did not think that there was value in having an avatar designed to mimic each individual player, it would not go through the lengths it does to achieve realism in this regard. Having chosen to use the players' likenesses, EA cannot now hide behind the numerosity of its potential offenses or the alleged unimportance of any one individual player. And I think- Do you have a page cite for that? I do not. I'm sorry, Your Honor. I would also like to point out something that EA's counsel raised. Unlike the current teams in the game, which has all 32 teams, EA only chose two to four of the best teams for a given year for the historic teams. So typically they picked the Super Bowl teams or teams that were extremely popular and made a deep playoff run. And by doing so, they were making a determination that those teams had particular value, and therefore they couldn't be incidental to the game. Now, going back to the transformed abuse test, I mean, here EA's game has ‑‑ it lists the players with the same height, the same weight, the same skin tone, the same age, same experience, same physical attributes. It seems to me we can assume that Keller governs on that question. But has the Supreme Court decided a case on the right of publicity in the First Amendment? Yes. Zucchini. Which one? Zucchini. Zucchini? Zucchini.  And in Zucchini, it addressed the issue of could a state enact a right of publicity law or did it ‑‑ did the First Amendment prohibit it? And it specifically held that it could. And what were the facts of Zucchini? It was a cannonball. A what? A news report had displayed a 90‑second clip of a human cannonball act. And it's a 40‑year‑old case. And it displayed the entire 90‑second act. And the plaintiff sued over right of publicity claiming that the commercial value of this act was misappropriated. And the court held that such a claim could survive a First Amendment challenge and that the states have the right to enact right of publicity laws and that they do not violate the First Amendment. And so, you know, I think that case ‑‑ and in Zucchini, the court specifically held that the right of publicity was very much akin to copyright or patent laws. And I think that's, again, what the strict scrutiny argument, which wasn't raised before the lower court, would conflict with that. I see I'm almost out of time. If there are any other questions. Thank you, Kevin. Thank you. Maybe you could provide the court with the ‑‑ because I looked at Keller. I can't find the footnote you're talking about. So you can provide the court and counsel with a cite to back up your question. You might even do it now and give the citation to the clerk and to your co‑counsel. You're opposing counsel. Thank you, Your Honor. Just briefly, the prior courts that we discussed that addressed right of publicity cases did not consider whether the right of publicity as applied to expressive works should be subject to strict scrutiny. What about the Zucchini case? Zucchini did not. And Zucchini, as many cases have subsequently noted, was a very narrow holding by the U.S. Supreme Court in a very unusual right of publicity case. What the court said in Zucchini ‑‑ But it wasn't commercial speech. It was not commercial speech. You're correct, Your Honor. It was a news report. What happened was there was a human cannonball. Mr. Zucchini had a human cannonball act. He shot himself. But doesn't ‑‑ it's not just inconsistent with your argument? I understood your argument, which I thought was interesting, to be that there is simply ‑‑ the First Amendment simply doesn't allow the right of publicity except for commercial speech, and because it's content-based discrimination. So Zucchini is completely inconsistent with that. No, Your Honor. I don't believe it is. Let me explain why, please. The ‑‑ Zucchini had to do with what the court called the usurpation of a performer's entire act. The television station showed the performer's entire human cannonball act while he was performing at the local county fair, thus effectively, you know, making folks not have to go and buy tickets to the fair to watch his act. I understand all that, but in terms of what your argument is, it seems to be directly inconsistent with it. No, because, Your Honor, I didn't actually argue before for a rule that per se expressive works were absolutely protected. What we say in our papers, for example, is that the appropriate test would be a combination for works like video games, books, films, a combination of the restatement standard with an overlay of Zucchini. And I think it's important that you overlay Zucchini, because Zucchini means you can't steal someone's livelihood, essentially, which was what the five justice majority in Zucchini was concerned about. Zucchini has been described by many subsequent courts as a subspecies of common law copyright claim and has very little application to the type of right of publicity claims that we're talking about that involve the incorporation of names and likenesses into broader expressive works, like the video game in question here, like the film or the comic book that was at issue in the Winter case. So what we had argued was for per se expressive works like video games and books to be subject to the restatement test with an overlay of Zucchini to prevent the situation that would be created in the Zucchini case or the hypothetical that's been raised in the SAG amicus brief about could you simply take a hologram or a CGI version of Tom Cruise and put him in your version of Mission Impossible 14, and a Zucchini overlay on top of the restatement would prevent that type of usurpation of a performer's act that the Court was concerned about in Zucchini. Thank you, Counsel. Thank you very much, Your Honor. If you'd like to speak on it, Your Honor. Sure. Give the clerk the citation. The case to start will be submitted.
judges: REINHARDT, FISHER, BERZON